Robert C. Soeder,                          :
                                           :
           Appellant                       :
                                           :
           v.                              :   No. 1437 C.D. 2015
                                           :   Argued:  June 6, 2016
Commonwealth of Pennsylvania,              :
Department of Transportation,              :
Bureau of Driver Licensing                 :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION BY**
**SENIOR JUDGE COLINS**                    **FILED:  October 31, 2016**


           Robert C. Soeder (Licensee) appeals from an order of the Court of Common Pleas of Somerset County (Trial Court) denying his appeal from a one-year suspension of his driver's license imposed by the Department of Transportation, Bureau of Driver Licensing (Department) for refusal of chemical testing in violation of Section 1547(b)(1)(i) of the Vehicle Code, 75 Pa. C.S. §1547(b)(1)(i), commonly known as the Implied Consent Law.  We affirm.

           This matter arises out of a June 7, 2014 incident in which Licensee crashed his car into a pole while driving on State Route 31 in Somerset County. Pennsylvania State Police Troopers Jeffrey M. Ely and Matthew C. Jones responded to the scene to investigate.  Following the crash, Licensee was taken by

ambulance to Somerset Hospital for treatment, and Trooper Jones traveled to the hospital in order to conduct chemical testing of Licensee.

By notice dated July 1, 2014, the Department informed Licensee that his license was suspended for a period of one year effective August 5, 2014 based on his refusal to submit to a chemical test on June 7, 2014. (Reproduced Record (R.R.) 6a-8a.) Licensee appealed the suspension and a *de novo* hearing was held before the trial court on May 1, 2015. (Petition for Appeal, R.R. 4a-5a; May 1, 2015 Hearing Transcript (H.T.), R.R. 11a-123a.)

At the hearing, Trooper Ely testified that he was dispatched on June 7, 2014 at 7:06 p.m. to the scene of a motor vehicle crash on State Route 31 in the vicinity of the Laurel Mountain Inn and when he arrived he observed that Licensee's vehicle had significant front-end damage. (H.T. 6-7, R.R. 15a-16a.) Upon arriving, Trooper Ely spoke with other emergency personnel who informed him that Licensee was wearing his seatbelt prior to the crash; no airbag deployed, and there was no evidence that Licensee's head hit the windshield. (H.T. 107-08, R.R. 116a-118a.) Trooper Ely testified that he spoke with Licensee while he was seated in the back of the ambulance and Licensee was confused as to how the accident occurred and where he was, his breath smelled of alcohol and his eyes were bloodshot and watery. (H.T. 8-9, 11, 109, R.R. 17a-18a, 20a, 118a.) Trooper Ely then asked Trooper Jones to follow Licensee to Somerset Hospital to request a chemical test from Licensee. (H.T. 9, R.R. 18a.) Trooper Ely also went to the hospital later after Trooper Jones had read the Department's DL-26 form to Licensee and observed Licensee to be combative and argumentative with the hospital staff, and he and Trooper Jones placed restraints on Licensee at the staff's request. (H.T. 9-10, R.R. 18a-19a.)

2

Trooper Jones testified that he arrived at the scene of the crash shortly after Trooper Ely but did not speak to Licensee until after he had been admitted to the hospital. (H.T. 14-15, R.R. 23a-24a.) Trooper Jones approached Licensee in the hospital emergency room asking him to state his name, date of birth, address and Social Security number. (H.T. 16, R.R. 25a.) Licensee was able to answer each of these questions correctly, although Trooper Jones testified that he detected the smell of alcohol on Licensee's breath. (*Id*.) At 8:08 p.m., Trooper Jones requested that Licensee submit to blood testing and proceeded to read the DL-26 report form warnings. (H.T. 17, R.R. 26a; Department Ex. 1, DL-26 Form.) According to Trooper Jones, Licensee stated after the first reading of the warnings that he was confused and did not understand; after Trooper Jones read the warnings a second time, Licensee became argumentative, asked to speak with an attorney and said "you're not taking my effing blood." (H.T. 18-19, R.R. 27a-28a.) After the second reading, Trooper Jones considered Licensee's responses a refusal and asked him to sign the DL-26 form acknowledging that he had been read the warnings and refused; Licensee refused to sign. (H.T. 19, R.R. 28a; Department Ex. 1, DL-26 Form.) Trooper Jones testified that he then went to meet Trooper Ely in the hospital parking lot; as he was leaving, a staff member came out to request assistance in restraining Licensee to the hospital bed based on his combative behavior. (H.T. 20-21, R.R. 29a-30a.)

Licensee testified that he had arrived alone at his second home on Stahl Road in Somerset, at approximately 3:30 to 4:00 p.m. on June 7, 2014. (H.T. 26-27, R.R. 35a-36a.) Licensee spoke with his neighbor James Muic for several minutes and then went in to his house to do work on his computer while drinking a glass of wine. (H.T. 27, 40, R.R. 36a, 49a.) Licensee decided to take a break from

3

his work and clean and while he was reaching into the closet to grab the vacuum cleaner he felt a burning pain on his arm and saw four hornets on his right wrist. (H.T. 27-28, R.R. 36a-37a.) Licensee testified that his wrist was swelling, burning and turning red so he decided to drive to the store and buy Benadryl. (H.T. 29-30, R.R. 38a-39a.) When he arrived at the intersection of Stahl Road and State Route 31, Licensee stated that he felt his throat closing up and was hyperventilating so he pulled over. (H.T. 30, R.R. 39a.) Licensee walked around the car to see if his breathing would improve, but it did not; he then returned to the car and without putting his seat belt back on pulled out onto Route 31 to head straight for the hospital. (H.T. 30-31, R.R. 39a-40a.) Licensee testified that the last thing he remembered was driving past a state park; he woke up in the hospital, restrained, with a nurse attempting to put an IV back in his hand. (H.T. 31-32, R.R. 40a-41a.) Licensee stated that he did not recall being read the warnings and had never seen the DL-26 form, although he "vaguely recall[ed] someone yelling at me from a distance." (H.T. 31-32, R.R. 41a-42a.) Licensee was discharged at approximately 11 p.m. and driven home by his neighbor, Muic; at that time he had a headache, pain in his ribs and legs and a cut on his head. (H.T. 33-34, 46-47, R.R. 42a-43a, 55a-56a.) Licensee visited his family doctor several days later and was prescribed an EpiPen for any future stings, although he was not given a test to conclusively determine whether he had an allergy to bee or hornet venom. (H.T. 35, 51, R.R. 44a, 60a.) On cross examination, Licensee denied the statements attributed to him in the EMT report that he was drinking vodka tonics rather than wine and that his crash was a result of him being distracted by a bee in the passenger compartment of his car. (H.T. 40, 44-45, R.R. 49a, 53a-54a.)

4

James Muic, Licensee's neighbor, testified that on the date of Licensee's accident, Licensee came over to his house and the two spoke for approximately 30 minutes. (H.T. 55-56, R.R. 64a-65a.) Approximately one hour later, Muic saw Licensee's car traveling down Stahl Road towards Route 31. (*Id*.) Muic's next contact with Licensee was in the late evening when Licensee called and asked him to pick Licensee up at the hospital. (H.T. 56, R.R. 65a.) When Muic arrived at the hospital, he helped Licensee into his truck and transported Licensee to his house and put him in bed. (H.T. 58-60, R.R. 67a-69a.) Muic testified that Licensee "wasn't [] fully himself," was "really, really groggy," "kind of spacey," had a "gash" on his forehead, appeared to have an injury to his right arm, was not able to carry a coherent conversation or clearly answer questions, and was nodding off during the drive. (H.T. 58-61, R.R. 67a-70a.)

Licensee also presented the expert testimony of James W. Smith, M.D., who is board certified in anatomic pathology, clinical pathology, forensic pathology and surgery. Dr. Smith testified that the hospital records that he reviewed showed that Licensee's blood was tested and he had a serum blood alcohol level of .082 grams per centimeter, equivalent to a whole blood alcohol level of .074, which is below the legal limit; Dr. Smith believed that this level of intoxication would not explain Licensee's behavior. (H.T. 71-80, 76, 95, R.R. 80a-81a, 85a, 104a.) Dr. Smith opined that Licensee was not capable of making a knowing and conscious refusal because Licensee was suffering from a post-concussive state as a result of his automobile accident and some residual effects from his mild anaphylactic reaction. (H.T. 74, 103-04, R.R. 83a, 112a-113a.) Dr. Smith attributed Licensee's aggressive behavior while at the hospital to his post-concussive state. (H.T. 86-87, 104, R.R. 95a-96a, 113a.) Though Licensee was

5

not diagnosed at the hospital with a concussion and x-rays showed no evidence of brain or spinal trauma, Dr. Smith testified that Licensee's account of amnesia regarding the crash was consistent with a concussion. (H.T. 75, 100-01, R.R. 84a, 109a-110a.) Dr. Smith stated that Licensee's account of his symptoms was also consistent with hornet stings and anaphylactic shock even though the emergency room doctor did not find evidence of stings and did not report any symptoms of anaphylactic shock, such as elevated pulse, blood pressure, difficulty breathing or obstruction of the airway. (H.T. 81-85, R.R. 90a-94a.) Dr. Smith admitted that Ativan, the drug administered to Licensee at the hospital to calm him down, could have led to the groggy and lethargic state described by Muic. (H.T. 92-93, R.R. 101a-102a.)

In its memorandum opinion, the trial court held that the Department had met its burden of proof in a license suspension case, concluding that there existed reasonable grounds to believe that Licensee was operating the vehicle under the influence of alcohol and that Trooper Jones' testimony demonstrated that Licensee was asked to submit to a blood test and warned that his refusal could result in a license suspension. In addition, the trial court held that Licensee's request to speak with an attorney despite being advised that he did not have such a right prior to chemical testing and his unequivocal declaration that Trooper Jones would not take his blood constituted a refusal to submit to chemical testing under the Implied Consent Law. The trial court further held that Licensee did not present sufficient evidence to meet his burden of showing that he was incapable of making a knowing and conscious refusal or that he was physically unable to make the refusal, finding that Licensee had not shown that he suffered from anaphylactic shock or a concussion. Even if he had shown such conditions, the trial court

6

concluded, Trooper Jones' description of Licensee's behavior demonstrated that Licensee comprehended his situation and made a meaningful refusal.

On appeal, Licensee presents three arguments.[1] First, Licensee argues that the Department did not meet its burden of proof to suspend his operating privileges for refusal of chemical testing because he was not under arrest when the request was made. In order to sustain a suspension of operating privileges under the Implied Consent Law, the Department is required to prove that the licensee (i) was arrested for driving under the influence by a police officer who had reasonable grounds to believe that the licensee was operating the vehicle under the influence of alcohol or a controlled substance; (ii) was asked to submit to a chemical test; (iii) refused to do so; and (iv) was warned that a refusal would result in a suspension of operating privileges. *Banner v. Department of Transportation, Bureau of Driver Licensing*, 737 A.2d 1203, 1206 (Pa. 1999); *Marone v. Department of Transportation, Bureau of Driver Licensing*, 990 A.2d 1187, 1190 (Pa. Cmwlth. 2010). Whether an arrest takes place for purposes of the Implied Consent Law is a factual rather than a legal determination. *Maletic v. Department of Transportation, Bureau of Driver Licensing*, 819 A.2d 640, 643 (Pa. Cmwlth. 2003) (*en banc*); *Pappas v. Department of Transportation, Bureau of Driver Licensing*, 669 A.2d 504, 507 (Pa. Cmwlth. 1996). "The relevant inquiry is whether the licensee, at the time the testing request is made, would have inferred from the totality of the circumstances that he or she was under the custody and

---

[1] Our scope of review of a trial court order sustaining a license suspension based upon a refusal to submit to chemical testing is limited to determining whether the trial court's findings are supported by competent evidence and whether the trial court committed an error of law or an abuse of discretion. *McKenna v. Department of Transportation, Bureau of Driver Licensing*, 72 A.3d 294, 298 n.5 (Pa. Cmwlth. 2013).

7

control of the police officer." *Maletic*, 819 A.2d at 643; *see also Pappas*, 669 A.2d at 507. The trial court held that the Department had satisfied the first part of this standard, finding that the Troopers had reasonable grounds to believe that Licensee was operating the vehicle under the influence of alcohol based on the smell of alcohol on his breath, his bloodshot eyes and the fact that he had wrecked his vehicle. However, the trial court did not make any specific finding as to whether Licensee was under arrest when the request for chemical testing was made.

Licensee argues that in order for there to be an arrest, there must be more than the simple statement in the DL-26 form warnings that a licensee is under arrest and instead the officer must deprive the licensee of freedom to move at will and place the licensee under the dominion, custody and control of the police. Licensee cites *Sfida v. Department of Transportation, Bureau of Driver Licensing*, 877 A.2d 537 (Pa. Cmwlth. 2005), and *Woods v. Department of Transportation, Bureau of Traffic Safety*, 541 A.2d 846 (Pa. Cmwlth. 1988), as supporting his argument that an arrest had not been effectuated. In *Sfida*, this Court held that it was beside the point in that case whether the licensee would have inferred from the totality of the circumstances that he or she was under arrest because there was clear evidence that he had never been arrested. 877 A.2d at 541. Specifically, in that case the officer went to the licensee's house shortly after he left the scene of a hit-and-run and the licensee refused requests to submit to field sobriety tests, a breath test at that location or a breath test at the police station. *Id*. at 538-39. The officer testified in *Sfida* that he never formally charged the licensee with leaving the scene of a crime or driving under the influence, directly contrary to what he wrote in an affidavit provided to the Department. *Id*. at 541-42.

In *Woods*, an officer responded to the scene of a single-car accident, noticed the licensee had wounds on her head and smelled strongly of alcohol and then followed the ambulance to the hospital; the officer again approached the licensee in the emergency room where she was refusing treatment and hostile towards the staff. 541 A.2d at 847. Though a doctor told the officer he could not interview her, he requested that the licensee submit to a blood test and she refused; the officer testified at trial that he never placed her under arrest, told her she could not leave or restricted her freedom in any other way. *Id*. at 847-48. This Court held there was no arrest because there was no attempt to restrict the licensee's freedom and the words or actions of the officer would not have notified a reasonable person that she was not free to go. *Id*. at 848-49.

The Department maintains that this case is identical to *Maletic*, wherein a police officer arrived at the scene of a single-car collision, spoke with the licensee at the scene who smelled of alcohol and admitted drinking and went to the hospital where he found the licensee in the emergency room on a gurney being treated by medical personnel. 819 A.2d at 641-42. The officer did not otherwise tell the licensee that she was under arrest or not free to leave, but he testified at the license suspension hearing that he considered reading the DL-26 form as placing her under arrest. *Id*. at 642. This Court held that under the totality of the circumstances, the reasonable impression of the licensee should have been that she was under the officer's custody and control, noting that the DL-26 warnings had been read advising her that she was under arrest and that "it is clear from the record that Licensee was not going to be leaving the hospital anytime soon because she was undergoing emergency medical treatment." *Id*. at 644.

9

We agree with the Department that *Woods* and *Sfida* are distinguishable from the instant case because in both of those cases there was no testimony that the officers made any statement or took any action that would indicate to the the licensees that they were under arrest whereas here Trooper Jones recited the DL-26 warning that directly informed Licensee that he was under arrest.[2] Moreover, we agree with the Department that this case is strikingly similar to *Maletic*. Here, as in *Maletic*, the Troopers responded to the scene of a single-vehicle crash, and Licensee was identified as the driver and sole occupant of that vehicle and was treated for injuries at the scene. Like in *Maletic*, Trooper Ely interviewed Licensee at the scene and detected evidence of intoxication, including the smell of alcohol on Licensee's breath, and then Trooper Ely requested that Trooper Jones follow the ambulance transporting Licensee to the hospital. Like in *Maletic*, Trooper Jones approached Licensee while he was being treated in the hospital emergency room and read the DL-26 form warning that stated that Licensee was under arrest without making any other statement or taking any other action that would provide notice to Licensee that he was in custody. We recognize that, unlike the officer in *Maletic*, Trooper Jones did not testify that he believed that by reading the DL-26 form warnings he was placing Licensee under arrest, but we do not conclude that the subjective intent of the officer alone is dispositive as to whether an arrest occurs and such intent is instead only one factor to consider in the relevant analysis. Accordingly, under the totality of the circumstances we recognize that there was substantial evidence pursuant to which the trial court

---

[2] The first DL-26 warning provides that: "You are under arrest for driving under the influence of alcohol or a controlled substance in violation of Section 3802 of the Vehicle Code." (Department Ex. 1, DL-26 Form.)

could conclude that Licensee was under arrest at the time the request for chemical testing was made.

Licensee next argues that he was not given a meaningful opportunity to respond to the request for a blood test and he therefore could not be found to have refused chemical testing under the Implied Consent Law. Licensee contends that Trooper Jones failed to provide him with a meaningful opportunity to respond to the request because he asked him to submit to chemical testing even though Licensee had been involved in an accident resulting in major damage to his car, had just arrived at the hospital and was confused and agitated with a visible head injury and he had not yet been tested for head trauma. A refusal to submit to chemical testing is "anything substantially less than an unqualified, unequivocal assent." *Department of Transportation v. Renwick*, 669 A.2d 934, 939 (Pa. 1996); *Lanthier v. Department of Transportation, Bureau of Driver Licensing*, 22 A.3d 346, 348 (Pa. Cmwlth. 2011). A licensee need not explicitly refuse to submit to testing but may demonstrate through his or her overall conduct a general unwillingness to submit to testing. *Renwick*, 669 A.2d at 969; *McKenna v. Department of Transportation, Bureau of Driver Licensing*, 72 A.3d 294, 299 (Pa. Cmwlth. 2013); *Lanthier*, 22 A.3d at 348.

Licensee cites several decisions of this Court, *Petrescko v. Department of Transportation, Bureau of Driver Licensing*, 745 A.2d 714 (Pa. Cmwlth. 2000), *Brown v. Department of Transportation, Bureau of Driver Licensing*, 738 A.2d 71 (Pa. Cmwlth. 1999) (*en banc*), and *Conrad v. Department of Transportation*, 598 A.2d 336 (Pa. Cmwlth. 1991), in which we have held that a refusal does not constitute a violation of the Implied Consent Law where the licensee was not given a meaningful opportunity to respond to the request to

11

submit to testing.  However, in each of those cases, the licensee was not given a meaningful opportunity to respond because the investigating officers placed extraneous conditions unrelated to the Implied Consent Law on the chemical test. *See Petrescko*, 745 A.2d at 715, 718 (being required to sign hospital consent form); *Brown*, 738 A.2d at 72-73 (having to leave child at police station to go to hospital to get blood drawn); *Conrad*, 598 A.2d at 337-38, 343 (being required to sign hospital consent form).  Here, by contrast, there is no indication, and Licensee does not argue, that Trooper Jones placed any extraneous conditions on his request to Licensee to submit to chemical testing.

Licensee's argument that he was not given a meaningful opportunity to respond is based on his alleged state of mind when the requests were made, which Licensee contends did not allow him to appreciate, understand and respond to Trooper Jones' requests.  However, such an argument based upon Licensee's mental condition fails because, as this Court has repeatedly observed, the Department is not required to prove that the officer making the request ensured that the licensee comprehends the DL-26 form warnings.  *See, e.g., McKenna*, 72 A.3d at 300-01 (stating that officer has no duty to answer licensee's questions or ensure that licensee fully comprehends warnings); *Martinovic v. Department of Transportation, Bureau of Driver Licensing*, 881 A.2d 30, 35 (Pa. Cmwlth. 2005) ("An officer's sole duty is to *inform* motorists of the implied consent warnings; once they have done so, they have satisfied their obligation.") (emphasis in original).  To the extent a licensee's medical condition is relevant in license suspension cases, as described in more detail below, it arises after the Department has proved its case in chief and falls upon the licensee to prove that he or she was unable to understand the request.  Because Trooper Jones twice read the DL-26

form warnings and asked Licensee to submit to a blood test and then allowed Licensee an opportunity to respond but those responses were less than an unequivocal assent, we conclude that the trial court did not err in determining that the Licensee refused the requests for chemical testing.

Licensee's final argument on appeal is that he was incapable of making a knowing and conscious refusal of a request for chemical testing because of a reaction to hornet stings and post-concussion syndrome. Licensee asserts that his inability to comprehend the DL-26 warnings was demonstrated by Trooper Jones' testimony that Licensee stated that he was confused and insisted three times that he had a right to an attorney despite being told each time that he did not have such a right. In addition, Licensee argues that his testimony, the testimony of his neighbor Muic and the expert medical evidence of Dr. Smith show that he could not make a knowing and conscious refusal because of his reaction to the hornet venom and his post-concussion syndrome. Licensee argues that Dr. Smith convincingly eliminated alcohol as a factor for Licensee's behavior, as evidenced by the hospital's serum blood alcohol level, and that the Department did not offer an alternate explanation for his behavior.

When the Department meets its burden of showing that the licensee refused chemical testing, the burden shifts to the licensee to show that he or she was not capable of making a knowing and conscious refusal or was physically unable to take the test. *Giannopoulos v. Department of Transportation, Bureau of Driver Licensing*, 82 A.3d 1092, 1094 (Pa. Cmwlth. 2013); *Kollar v. Department of Transportation, Bureau of Driver Licensing*, 7 A.3d 336, 339 (Pa. Cmwlth.

13

2010).  Generally, medical expert testimony[3] is required to establish that a licensee was incapable of providing a knowing and conscious refusal of chemical testing. *Lanthier*, 22 A.3d at 349; *Kollar*, 7 A.3d at 340.  The medical expert must also rule out alcohol as a contributing factor to the licensee's inability to offer a knowing and conscious refusal.  *Lanthier*, 22 A.3d at 349 n.2; *Kollar*, 7 A.3d at 340.  However, medical evidence is not required where there are severe, obvious and incapacitating injuries.  *Lanthier*, 22 A.3d at 349; *Kollar*, 7 A.3d at 340 n.2.

The issue of whether a licensee is able to make a knowing and conscious refusal to chemical testing is one of fact to be made by the trial court. *Barbour v. Department of Transportation, Bureau of Driver Licensing*, 732 A.2d 1157, 1160 (Pa. 1999); *Lanthier*, 22 A.3d at 349.  Resolving conflicts in the evidence and making credibility determinations are solely the province of the trial court as fact-finder.  *Reinhart v. Department of Transportation, Bureau of Driver Licensing*, 954 A.2d 761, 765 (Pa. Cmwlth. 2008); *Duffy v. Department of Transportation, Bureau of Driver Licensing*, 694 A.2d 6, 10 (Pa. Cmwlth. 1997). Furthermore, the trial court may accept or reject the testimony of any witness in whole or in part.  *Reinhart*, 954 A.2d at 765; *Duffy*, 694 A.2d at 10.

In concluding that Licensee did not show that he was incapable of making a knowing and conscious refusal of the request for a blood test, the trial court noted that Licensee's credibility was called into question because his testimony was inconsistent with his statements in the EMT report that he was stung by a bee while driving and had been drinking vodka tonics.  The trial court

---

[3] To be competent, the medical expert must offer an opinion that is unequivocal and is within a reasonable degree of medical certainty.  *Barbour v. Department of Transportation, Bureau of Driver Licensing*, 732 A.2d 1157, 1160 (Pa. 1999); *Kollar*, 7 A.3d at 340.

observed that Licensee's account that he was unable to make a knowing and conscious refusal was also not consistent with the testimony of the Troopers that he was able to recite his name, address and social security number without incident and that he asked for an attorney three times while Trooper Jones read the DL-26 warnings. The trial court also found the medical evidence of a condition affecting his ability to refuse the test to be insufficient because Dr. Smith based his conclusion of anaphylactic shock entirely on Licensee's account when the emergency room found no evidence to confirm a hornet sting or a reaction and because Dr. Smith based his conclusion that Licensee suffered a concussion solely on the cut on Licensee's head and his combative state and despite the testing that showed no brain injury. Finally, the trial court concluded that even if Licensee suffered from anaphylactic shock or a concussion his behavior following the requests, specifically his demand to speak with an attorney three times, showed that he comprehended the situation and made a meaningful refusal. The determinations on the credibility of the witnesses and evidentiary weight are well-supported by the evidence presented at the hearing. Therefore we will not disturb the determination that Licensee was capable of making a knowing and conscious refusal.

For the foregoing reasons, we affirm.

_____
JAMES GARDNER COLINS, Senior Judge

15

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Robert C. Soeder, | : | |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | No. 1437 C.D. 2015 |
| | : | |
| Commonwealth of Pennsylvania, | : | |
| Department of Transportation, | : | |
| Bureau of Driver Licensing | : | |

## **O R D E R**

AND NOW, this 31st day of October, 2016, the order of the Court of Common Pleas of Somerset County in the above-captioned case is AFFIRMED.

_____
JAMES GARDNER COLINS, Senior Judge